STUDIENGESELLSCHAFT KOHLE mbH, as Trustee for the Max-Planck-Institut fur Kohlenforschung, Plaintiff-Appellant,

v.

EASTMAN KODAK COMPANY, Defendant-Appellee.

No. 77–3230.

United States Court of Appeals, Fifth Circuit.

May 15, 1980.

Rehearing Denied July 8, 1980.

Sprung, Felfe, Horn, Lynch & Kramer, Arnold Sprung, Nathaniel D. Kramer, New York City, for plaintiff-appellant.

Francis T. Carr, Alan T. Bowes, Kenneth E. Madsen, William J. Speranza, New York City, O. J. Weber, Beaumont, Tex., for defendant-appellee.

Before COLEMAN, Chief Judge, FRANK M. JOHNSON, Jr. and POLITZ, Circuit Judges.

COLEMAN, Chief Judge.

*Opinion Outline*

I. Background
 A. The Chemistry Involved
 B. The Legal Principles
II. Laches & Estoppel
 A. The Legal Background
 B. Application to the Facts
III. The '332 Patent
 A. Estoppel
 B. Scope of the '332 Patent
IV. The '792 Patent
 A. Validity
 1. Prior Art
 2. Other Challenges
 B. Infringement

Summary

Studiengesellschaft Kohle mbH (SGK) charged Eastman Kodak Company (Eastman) with infringement of patents obtained by Professor Karl Ziegler covering certain chemical catalysts useful in the polymerization of hydrocarbons. Acting as Trustee for the Max-Planck-Institut für Kohlenforschung, the predecessor in interest to the Ziegler patents, SGK accused Eastman of violating U.S. Letters Patent No. 3,113,115 ('115); No. 3,257,332 ('332); No. 3,231,515 ('515); No. 3,392,162 ('162); and No. 3,826,-792 ('792). The alleged infringement took place at Eastman's Longview, Texas, plant, where Eastman used a special catalyst, known as its "409 catalyst" to produce polypropylene. SGK contends that Eastman's process and catalyst employ the teachings of the listed patents, resulting in infringement. Although SGK initially sought an injunction against Kodak's activity, it subsequently sought instead compensation for use by Kodak of SGK's patented invention.

The patents cover catalysts and processes for polymerizing certain hydrocarbons. In essence the patents teach that by mixing certain organometal compounds, particularly an organoaluminum compound, with a compound of a metal of Group IVB, VB, or VIB of the Periodic System of Elements, such as a titanium salt, a polymerization catalyst would be produced that polymerized olefins much more effectively than was previously possible. SGK sought a broad reading to the patents and an equally large protection against the unlicensed use of the teachings of the patents.

Eastman's 409 process employs a catalyst composed of lithium butyl (LiBu), aluminum triethyl (AlEt$_3$), and hydrogen-reduced alpha titanium trichloride (H-δ-TiCl$_3$) at a temperature of 160° C. and a pressure of 71 atmospheres to produce polypropylene. SGK contended that this process was directly covered by the patents.

Eastman denied infringement, asserting that it uses additional components not specified in the patents under different conditions to produce a different product. Eastman further asserted that various claims of the patents were invalid because of existing prior art. Finally Eastman argued that SGK's claims were barred by laches.

Prior to trial SGK sought to remove the '115 patent from suit, and the claims based upon it were dismissed with prejudice. Following a two-week trial, the District Court allowed the taking and filing of post-trial depositions and the submission of additional exhibits. It subsequently accepted substantial post-trial briefs and heard lengthy oral argument from both sides. At the conclusion of these extensive proceedings, the Court found that Eastman had not infringed the remaining patents, held that certain claims of the '792 patent were invalid, and concluded, alternatively, that SGK's claims were barred by laches. *Studiengesellschaft Kohle v. Eastman Kodak*, 450 F.Supp..1211 (E.D.Tex.1977).

Although four patents were at issue in the District Court's opinion, SGK has appealed the trial court's determination on only the '332 and '792 patents. SGK urges on appeal that the District Court erred (1) in finding the action barred by laches, (2) in failing to find infringement of the '332 and '792 patents, (3) in finding claims 22 to 32 of the '792 patent anticipated by prior art, (4) in holding claims of the '792 patent invalid for failure to comply with various statutory disclosure requirements, (5) in failing to dismiss defendant's "unclean hands" and "inequitable conduct" defenses as not being properly pleaded and not properly before the Court, and (6) in arbitrarily and summarily ordering SGK to produce numerous documents previously held privileged by the Special Master.

After an extensive examination of the voluminous record, we find that the suit is not barred by laches, and we affirm the decision of the district court as to the infringement and reverse as to the validity issues. We dismiss SGK's procedural objections as being without merit.

## I. BACKGROUND

### A. *The Chemistry Involved*

We must begin with a general discussion of the chemistry underlying the patents at issue. The basic principles of the relevant organic chemistry were described in considerable detail in *Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858 (5th Cir.), *cert. denied*, 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973). We review them briefly here.

The simplest hydrocarbon molecule is a compound of one carbon atom and four hydrogen atoms and is commonly known as methane, represented by the chemical symbol CH$_4$. Because the molecule is bonded together exclusively by single pairs of electrons, methane is known as a saturated hydrocarbon.[1] The carbon atom in methane may form single bonds with additional car-

---

1. The chemical configuration of CH$_4$ is diagrammed as follows:

$$H - \overset{\displaystyle H}{\underset{\displaystyle H}{\overset{|}{\underset{|}{C}}}} - H$$

bon atoms, forming other saturated hydrocarbons, such as ethane ($C_2H_6$), propane ($C_3H_8$), and butane ($C_4H_{10}$). These molecules are called members of a homologous series.

Carbon atoms may also bond to each other in double bonds, producing unsaturated hydrocarbons. The simplest of these is ethylene ($C_2H_4$).[2] The addition of other carbon atoms by single bonds produces another homologous series whose members include propylene ($C_3H_6$) and butylene ($C_4H_8$). This unsaturated series is known as the olefin series or as ethylenically unsaturated hydrocarbons. The double bond connecting the adjacent carbon atoms is known as an unsaturated or olefinic bond. In ethylene the double bond must be at the end, but in higher members of the series the unsaturated bond may appear at other locations within the hydrocarbon chain. Where the unsaturated bond occurs at the end of the hydrocarbon chain, the compound is called an alpha olefin.[3]

The patents in suit claim to teach chemical processes and catalysts which produce synthetic polymers of hydrocarbons. These products are formed by causing hydrocarbon molecules to link together in long chains, called polymers. Thus a synthetic polymer may be produced by causing individual molecules of, say, ethylene to link together into one long chain, called polyethylene. In this case the smaller molecule, ethylene, is called a monomer. Polyethylene is, of course, the polymer. Similar polymers may be produced from other members of the olefin series. The linking of the monomers is termed a polymerization reaction, and the polymerization catalyst is that which causes the monomers to link together to form polymers. A catalyst is defined as a substance which affects the rate or course of a given chemical reaction in some manner without becoming a significant part of the reaction product. Normally, catalysts are used in relatively small amounts as compared with the reactants.

The patents at issue arise from the activities of Dr. Karl Ziegler, who was Director of the Max-Planck-Institut für Kohlenforschung. In 1953 Ziegler and three co-workers discovered that several combinations of an organo aluminum compound and a compound of a metal of Groups IVB, VB, or VIB of the Periodic System of Elements produced polymerization catalysts that polymerized ethylene much more effectively than was previously possible. The catalysts caused monomers to combine in a linear fashion, forming straight and not branched chains, without requiring the formation process to include high pressures or excessive temperatures. Although Ziegler experimented with a number of different compounds, the ones most relevant here are aluminum triethyl and a titanium chloride salt, particularly titanium tetrachloride.

The development of these various polymerization catalysts was recognized as a great scientific achievement, and Ziegler and his co-workers were awarded the Nobel Prize for their accomplishment. Following his initial success, Ziegler pursued a policy of actively patenting and licensing his new catalyst. In late 1953, he filed German applications Z3799, Z3862, and Z3882 which are the predecessors to the '332 patent before us. In 1954 he filed additional German applications, Z4348, Z4375, Z4629. SGK relies in part on these to sustain the '792 patent.

After his initial discovery, Ziegler continued his experiments with catalysts for a broad range of olefinic polymers. The news of Ziegler's success with polyethylene prompted vigorous research by scientists around the world, as they and Ziegler

---

**2.** The double bond is represented below:

```
H H
| |
C = C
| |
H H
```

**3.** The following diagram of propylene shows the characteristic location of the double bond in alpha olefins:

```
H H H
| | |
C = C — C — H
| |
H H
```

worked on ways to improve the effectiveness of the catalysts and to polymerize higher members of the series. In Italy Professor Giulio Natta was contemporaneously working in polymer research. Using the catalyst Ziegler had developed, Natta succeeded in polymerizing propylene and in characterizing its stereostructure.

Ethylene is symmetrical and reacts readily to form long linear and uniform polymer chains. Propylene, on the other hand, because of the additional methyl group, is asymmetrical and can form different polymer structures—called stereostructures—depending upon the position the methyl group takes. If the methyl groups in a propylene polymer chain are oriented in a non-uniform or random way, the resulting polymer is soft, pliable, tacky, and amorphous; it is called "atactic." When the methyl groups in the chain are oriented such that they appear repeatedly in the same relative position, the resulting polymer is hard, tough, and highly crystalline. Polypropylene of this "stereoregular" structure is called "isotactic." A catalyst which polymerizes propylene in such a way that the regular "isotactic" stereostructure is preferentially formed is considered a "stereospecific" catalyst.

Natta further discovered that by using a compound of solid crystalline titanium trichloride in the "alpha" form, he was able to polymerize propylene to a polymer very rich in the highly crystalline "isotactic" structure. Because of his work in polymerizing propylene, Natta shared the Nobel Prize with Ziegler. Natta also pursued an active patenting policy.

Meanwhile, Eastman was at work on its own research, directed to developing catalysts that would make good yields of highly crystalline polypropylene of high molecular weight, in a solution process in which the temperature conditions were above 150° C. in order to dissolve the polymer in a hot solvent carrier. Eastman's first commercial catalysts, known as its "402" catalysts, used an alkali metal compound, lithium aluminum hydride ($LiAlH_4$), co-reacted with hydrogen-reduced alpha titanium trichloride ($H-\delta-TiCl_3$).

Although the 402 catalyst produced the product Eastman desired, Eastman sought a more economical catalyst for the manufacture of the same product. This desire led to the development of the 409 catalyst which is the object of this suit. The 409 catalyst is prepared from the co-reaction of lithium butyl (LiBu), aluminum triethyl ($AlEt_3$), and hydrogen reduced alpha titanium trichloride ($H-\delta-TiCl_3$) in a mol ratio of 0.3 to 0.3 to 1.0. The 409 catalyst received a plant trial on one of Eastman's three production lines at the Longview plant during the period of April-June 1967. Thereafter, 409 replaced 402 on all production lines.

In April 1974 Eastman entered into a license agreement with Natta's assignee, wherein Eastman received protection under all of Natta's basic patents and applications in the polypropylene field.

### B. *The Legal Principles*

■ The issues before us involve both questions of fact and questions of law. The issue of patent infringement is a question of fact, *Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858, 867 (5th Cir.) *cert. denied*, 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973), while the ultimate question of patent validity is one of law, *Bird Provision Co. v. Owens Country Sausage, Inc.*, 568 F.2d 369 (5th Cir. 1978). Even when the ultimate issue is a legal one, the conclusion of law must be based on the results of several factual inquiries. *See, e. g., Graham v. John Deere Company of Kansas City*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966); *Control Components, Inc. v. Valtek Inc.*, 609 F.2d 763, 766 (5th Cir. 1980); *Parker v. Motorola, Inc.*, 524 F.2d 518, 531 (5th Cir. 1975), *cert. denied*, 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976).

■ When the questions involved are factual ones, our review of the District Court's findings must be limited to the "clearly erroneous" standard of Rule 52(a). If the findings of fact are not clearly erroneous, the only issue on appeal is whether the legal conclusion drawn from those facts is correct. *Cathodic Protection Service v.*

*American Smelting and Refining Co.*, 594 F.2d 499, 506 (5th Cir. 1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 453, 62 L.Ed.2d 378 (1979); *Kaspar Wire Works, Inc. v. Leco Engineering & Machinery, Inc.*, 575 F.2d 530, 543 (5th Cir. 1978). *Fred Whitaker Co. v. E. T. Barwick Industries, Inc.*, 551 F.2d 622, 627 (5th Cir. 1977); *Parker v. Motorola, Inc.*, 524 F.2d 518, 531 (5th Cir. 1975), *cert. denied*, 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976); *Ziegler v. Phillips Petroleum Co.*, 483 F.2d at 867.

The Supreme Court has emphasized the deference due the findings of the trial court in complex cases, such as this one "where so much depends upon familiarity with specific scientific problems and principles not usually contained in the general storehouse of knowledge and experience." *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 610, 70 S.Ct. 854, 857, 94 L.Ed. 1097 (1950). We have likewise noted that patent cases, because they so frequently contain conflicts in expert testimony, seem particularly suited for Rule 52(a)'s review limitations. *Kaspar Wire Works, Inc. v. Leco Engineering & Machinery Inc.*, 575 F.2d at 543; *Bird Provision Co. v. Owens Country Sausage, Inc.*, 568 F.2d at 372.

SGK seems to urge that we adopt a more rigorous standard of review because the trial judge "wholly failed to grasp the technology involved or the legal standards set forth in this Court's earlier decision [in *Phillips*]." Brief at 3. Pointing to some of the judge's remarks during the trial, SGK apparently contends that the judge had absolutely no understanding of the factual matters before him. This prompts SGK to assert that "this is one of those unfortunate cases where there was no 'understanding analysis of the evidence' or reasoned application of the law to the facts." Brief at 5. SGK then urges that we apply the principles of *Phillips* to the evidence in the case before us.

We decline SGK's invitation to consider the evidence de novo. The district judge's decision did not come immediately upon the completion of the trial or without further help from counsel in understanding the evidence and the applicable law. Rather, the judge requested extensive post-trial briefs and summaries of the evidence, heard lengthy oral argument from both sides, and took the case under advisement for five months before issuing a lengthy and detailed opinion. Indeed, the final judgment came almost one year after the conclusion of the trial.

■ SGK also seems to question the trial court's understanding because of the court's heavy reliance upon the proposed findings Eastman submitted to the court. We note first that the District Court did not adopt Eastman's findings verbatim. There was considerable reworking of Eastman's proposed findings; some were omitted, while others were rearranged, reworded, or otherwise revised. These revisions indicate that the Court was working through the analysis on its own, but finding itself in agreement with Eastman's position. There is absolutely nothing improper with this.

■ Second, we note that even if the Court had adopted Eastman's proposed findings verbatim, that would not have been sufficient grounds for causing us to engage in a de novo review of the evidence. The clearly erroneous test applies whether the court drafts its own findings of fact or adopts the findings submitted by a party. *Kaspar Wire Works, Inc. v. Leco Engineering & Machinery Co.*, 575 F.2d at 543; *Fred Whitaker Co. v. E. T. Barwick Industries, Inc.*, 551 F.2d at 627 n. 12; *Keystone Plastics, Inc. v. C & P Plastics, Inc.*, 506 F.2d 960, 962–63 (5th Cir. 1975); *see also United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 657, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964); *Florida Board of Trustees of Internal Improvement Trust Fund v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 703 (5th Cir. 1975).

■ In view of the foregoing circumstances and case·law, we believe that the District Court performed its function adequately in its consideration of the evidence.

■ As we noted earlier, however, not all the issues in this case are purely factual. In determining whether a patent has been

infringed, it is necessary for the court to construe the patent. The construction of a patent is a matter of law, and appellate courts are not bound by the limitations of Rule 52(a) when examining the District Court's construction of the patent. *Fred Whitaker Co. v. E. T. Barwick Industries, Inc.,* 551 F.2d at 629 n. 19; *Ziegler v. Phillips Petroleum Co.,* 483 F.2d at 867; *Harrington Manufacturing Co., Inc. v. White,* 475 F.2d 788, 796 (5th Cir.) *cert. denied,* 414 U.S. 1040, 94 S.Ct. 542, 38 L.Ed.2d 331 (1973). Of course, factual findings may be employed in arriving at the patent's proper construction.

■■■■■■ After the court has articulated the scope of the patent by construing it, the court must then explore the infringement issues. In doing so, it may use two analytical techniques, literal infringement and the doctrine of equivalents. As the Supreme Court stated in *Graver Tank & Manufacturing Co., Inc. v. Linde Air Products,* 339 U.S. at 607, 70 S.Ct. at 855, "In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it." See also *Ziegler v. Phillips Petroleum Co.,* 483 F.2d at 868; *Williams Bit & Tool Co. v. Christensen Diamond Products Co.,* 399 F.2d 628 (5th Cir. 1968). In considering literal infringement, the patent's claims must be read in connection with patent's specification and its file history, and the claims of patent cannot be given a construction broader than the teachings expressed in the patent. *Marvin Glass & Associates v. Sears, Roebuck & Co.,* 448 F.2d 60, 62 (5th Cir. 1971); *Kemart Corp. v. Printing Arts Research Laboratories,* 201 F.2d 624 (9th Cir. 1953).

■■■■ As we noted in *Phillips,* however, minor modifications in a patented invention are sufficient to put the item beyond the scope of literal infringement. In recognition of this fact, courts have developed the doctrine of equivalents to protect patentees from inventions that perform substantially the same function substantially the same

way to obtain substantially the same result. *Gaddis v. Calgon Corp.,* 506 F.2d 880, 887 (5th Cir. 1975); *Ziegler v. Phillips Petroleum Co.,* 483 F.2d at 868; *Phillips Petroleum Co. v. Sid Richardson Carbon & Gas Co.,* 416 F.2d 10, 11 (5th Cir. 1969); *Texsteam Corp. v. Blanchard,* 352 F.2d 983, 986 (5th Cir. 1965), *cert. denied,* 387 U.S. 936, 87 S.Ct. 2064, 18 L.Ed.2d 1000 (1967); *Up-right Inc. v. Safway Products, Inc.,* 315 F.2d 23, 27 (5th Cir. 1963); *Stewart-Warner Corp. v. Lone Star Gas Co.,* 195 F.2d 645, 648 (5th Cir. 1952).

■■■■■■ Several factors guide the analysis of an infringement claim under the doctrine of equivalents. As the Supreme Court has observed, what constitutes equivalency "must be determined against the context of the patent, the prior art, and the particular circumstances of the case." *Graver Tank & Manufacturing Co., Inc. v. Linde Air Products,* 339 U.S. at 609, 70 S.Ct. at 856. In examining the context of the patent itself, the patent claims must be construed in the light of the description and the real invention disclosed in the patent's specifications and examples. The specific facets of the invention described in the patent are guides to objects covered by the patent, but they are not necessarily the exclusive description of the invention. *See Continental Paper Bag Co. v. Eastern Paper Bag Co.,* 210 U.S. 405, 419, 28 S.Ct. 748, 751, 52 L.Ed. 1122 (1908); *Ziegler v. Phillips Petroleum Co.,* 483 F.2d at 869 and cases cited therein. The nature of the invention itself affects the range of equivalents. A "pioneer" patent, which covers a function never performed before, receives a much broader protection than a patent which merely makes minor improvements upon existing technology. *See* cases cited in *Ziegler v. Phillips Petroleum Co.,* 483 F.2d at 869–70. At the same time, the range of equivalents is limited by the patentee's surrender or amendment of claims in response to demands of the patent examiner, so-called "file wrapper estoppel." *Ziegler v. Phillips Petroleum Co.,* 483 F.2d at 870; *Williams Bit & Tool Co. v. Christensen Diamond Products Co.,* 399 F.2d at 633–34.

## II. LACHES AND ESTOPPEL

### A. *The Legal Background*

Eastman contends, and the District Court held, that SGK's claims are barred by the equitable doctrines of laches and estoppel. Although this Circuit has had before it a multitude of patent cases, it appears that we have directly addressed these issues only once in the context of a patent, *Shaffer v. Rector Well Equipment Co.*, 155 F.2d 344 (5th Cir. 1946). Consequently, we will look to the teachings of other circuits for additional guidance in this area.

 At the outset we note that the only statute of limitations involving patent infringement suits merely limits the period of recovery of damages to six years. It does not expressly limit the patentee's right to maintain an action. 35 U.S.C. § 286.[4] *TWM Manufacturing Co., Inc. v. Dura Corp.*, 592 F.2d 346, 348 (6th Cir. 1979).

 Laches and estoppel are equitable defenses whose appropriateness must be determined in each case under its particular factual situation. *Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d 477, 479 (7th Cir.) *cert. denied*, 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 99 (1975); *Potash Co. of America v. International Minerals & Chemical Corp.*, 213 F.2d 153, 155 (10th Cir. 1954); *Shaffer v. Rector Well Equipment Co.*, 155 F.2d at 345. Whether the plaintiff should be barred by laches or estoppel is to be determined by the trial judge in the exercise of judicial discretion, and his findings will be reversed only if they are clearly erroneous. *Baker Manufacturing Co. v. Whitewater Manufacturing Co.*, 430 F.2d 1008, 1009 (7th Cir. 1970) *cert. denied*, 401 U.S. 956, 91 S.Ct. 978, 28 L.Ed.2d 240 (1971); *General Electric Co. v. Sciaky Brothers, Inc.*, 304 F.2d 724, 727 (6th Cir.

1962); *Potash Co. of America v. International Minerals & Chemical Corp.*, 213 F.2d at 155.

 Although laches and estoppel are related concepts, there is a clear distinction between the two. *TWM Manufacturing Co., Inc. v. Dura Corp.*, 592 F.2d at 349–50; *Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d at 479; *Continental Coatings Corp. v. Metco, Inc.*, 464 F.2d 1375, 1379 (7th Cir. 1972). The defense of laches may be invoked where the plaintiff has unreasonably and inexcusably delayed in prosecuting its rights and where that delay has resulted in material prejudice to the defendant. The effect of laches is merely to withhold damages for infringement which occurred prior to the filing of the suit. *Advanced Hydraulics, Inc. v. Otis Elevator*, 525 F.2d at 479; *American Home Products Corp. v. Lockwood Manufacturing Co.*, 483 F.2d 1120, 1122 (6th Cir. 1973), *cert. denied*, 414 U.S. 1158, 94 S.Ct. 917, 39 L.Ed.2d 110 (1974); *Shaffer v. Rector Well Equipment Co.*, 155 F.2d at 345.

 Estoppel, on the other hand, "arises only when one has so acted as to mislead another and the one thus misled has relied upon the action of the inducing party to his prejudice." *Lebold v. Inland Steel Co.*, 125 F.2d 369, 375 (7th Cir. 1941); *see also Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d at 479; *Armstrong v. Motorola, Inc.*, 374 F.2d 764 (7th Cir. 1967). Estoppel forecloses the patentee from enforcing his patent prospectively through an injunction or through damages for continuing infringement. *Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d at 479; *Continental Coatings Corp. v. Metco, Inc.*, 464 F.2d at 1379; *George J. Meyer Manufacturing Co. v. Miller Manufacturing Co.*, 24 F.2d 505, 507 (7th Cir. 1928).

---

4. § 286. *Time limitation on damages*

Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action.

In the case of claims against the United States Government for use of a patented invention, the period before bringing suit, up to six years, between the date of receipt of a written claim for compensation by the department or agency of the government having authority to settle such claim, and the date of mailing by the Government of a notice to the claimant that his claim has been denied shall not be counted as part of the period referred to in the preceding paragraph.

In considering whether plaintiff's delay in litigating his claim makes him guilty of laches, courts use the six-year statutory period for damages as a frame of reference, *TWM Manufacturing Co., Inc. v. Dura Corp.*, 592 F.2d at 348; *General Electric Co. v. Sciaky Brothers, Inc.*, 304 F.2d at 727; *Whitman v. Walt Disney Productions, Inc.*, 263 F.2d 229, 231 (9th Cir. 1958); but laches may also bar a suit brought within the period specified by the corresponding statute of limitations. *Whitman v. Walt Disney Productions, Inc.*, 263 F.2d at 232.

Mere delay in bringing suit is not, of itself, sufficient to constitute laches in a patent infringement action. *Maloney-Crawford Tank Corp. v. Rocky Mountain Natural Gas Co., Inc.*, 494 F.2d 401, 403 (10th Cir. 1974); *Jenn-Air Corp. v. Penn Ventilator Co.*, 464 F.2d 48, 50 (3rd Cir. 1972). Instead, two elements must be established: (1) that the delay was unreasonable or inexcusable; (2) that the defendant has suffered injury or prejudice as a result of the delay. *Advanced Hydraulics, Inc. v. Otis Elevator Company*, 525 F.2d at 479; *Maloney-Crawford Tank Corp. v. Rocky Mountain Natural Gas Co., Inc.*, 494 F.2d at 403; *American Home Products Corp. v. Lockwood Manufacturing Co.*, 483 F.2d at 1122; *Jenn-Air Corp. v. Penn Ventilator Co.*, 464 F.2d at 50; *Potash Co. of America v. International Minerals & Chemical Corp.*, 213 F.2d at 154; *Shaffer v. Rector Well Equipment Co.*, 155 F.2d at 345; *Technitrol, Inc. v. Memorex Corp.*, 376 F.Supp. 828, 830–31 (N.D.Ill.1974), *affirmed*, 513 F.2d 1130 (7th Cir. 1975) (per curiam).

Although at one time the courts seemed divided over the relative burdens the parties must bear under a laches defense, recent cases reflect a growing unanimity among the circuits. Where the plaintiff's delay has exceeded the statutory six-year period, the delay is presumed unreasonable, and the plaintiff has the burden of justifying the delay. Similarly, when the delay exceeds six years, injury to the defendant is presumed, and the defendant need not necessarily produce additional evidence of prejudice. *TWM Manufacturing*

*Co., Inc. v. Dura Corp.*, 592 F.2d at 349; *Continental Coatings Corp. v. Metco, Inc.*, 464 F.2d at 1378; *Baker Manufacturing Co. v. Whitewater Manufacturing Co.*, 430 F.2d at 1009; *Technitrol, Inc. v. Memorex Corp.*, 376 F.Supp. 828, 831 (N.D.Ill.1974), *affirmed*, 513 F.2d 1130 (7th Cir. 1975) (per curiam). Where the action is brought within the analogous limitation period, however, the defendant must show both that the delay is unreasonable and that he has suffered injury. *Maloney-Crawford Tank Corp. v. Rocky Mountain Natural Gas Co., Inc.*, 494 F.2d at 404. *Jenn-Air Corp. v. Penn Ventilator Co.*, 464 F.2d at 50.

To determine the length of plaintiff's delay, the court must look not to the date on which the patent issued but rather to the time at which the plaintiff knew or, in the exercise of reasonable diligence, should have known of the defendant's alleged infringing action. *See TWM Manufacturing Co., Inc. v. Dura Corp.*, 592 F.2d at 349 (period of delay begins to run from the notice of infringement given to defendant); *Maloney-Crawford Tank Corp. v. Rocky Mountain Natural Gas Co., Inc.*, 494 F.2d at 403 (where known infringement began before plaintiff obtained title to patent, delay is measured from time title was obtained); *Moore v. Schultz*, 491 F.2d 294, 300–01 (10th Cir. 1974) (period begins when plaintiff became aware of the possible infringement); *Potash Co. of America v. International Minerals & Chemical Corp.*, 213 F.2d at 155 (laches will not be imputed to one who has been justifiably ignorant of facts which create his right of action, but he must be diligent and make such inquiry and investigation as the circumstances reasonably suggest).

The Courts have recognized a variety of factors which constitute prejudice to the defendant because of plaintiff's delay. Chief among these are the fact that important witnesses have died, that the memories of other witnesses have been dulled, that relevant records have been destroyed or are missing, and that the defendant has made heavy capital investments in its facilities in order to expand production connected with

the alleged infringing article. *See, e. g., Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d at 482; *Continental Coatings Corp. v. Metco, Inc.*, 464 F.2d at 1378; *Potash Co. of America v. International Minerals & Chemical Corp.*, 213 F.2d at 160; *Brennan v. Hawley Products Co.*, 182 F.2d 945, 948 (7th Cir. 1950).

The factors which will excuse delay in bringing an infringement suit are less clear. The chief subject of dispute in this area is the plaintiff's activity in pursuing other infringement suits during the period of delay. Earlier cases stated forthrightly that other infringement litigation justified the plaintiff's delay. In *Clair v. Kastar, Inc.*, 148 F.2d 644, 646 (2d Cir. 1945), for example, the Second Circuit stated that "[w]hile a patentee is getting his patent sustained [in another suit] he is not bound to assert his claims to their fullest scope by suing every conceivable infringer." Similarly, the Eighth Circuit, in *Montgomery Ward & Co. v. Clair*, 123 F.2d 878, 883 (8th Cir. 1941) held that an inventor "is not required to litigate the validity of his patent against every possible infringer." In *Montgomery Ward*, during the period of delay the plaintiff was litigating the validity of the patent until approximately two months before the suit in question. *See also Jenn-Air Corp. v. Penn Ventilator Co.*, 464 F.2d at 50 ("it is sound law . . . that [plaintiff] is not necessarily bound to take on more than one infringer at a time"). In viewing other litigation as a reasonable excuse for delay, the courts have noted that patent litigation is often unusually complex, lengthy, and expensive, and forcing the patentee to litigate simultaneous challenges to the patent's validity could be inequitable. *See American Home Products Corp. v. Lockwood Manufacturing Co.*, 483 F.2d at 1123.

More recent cases, however, have rejected the idea that litigation of the patent's validity in another suit is per se sufficient justification for the delay in instituting the current litigation. *See, e. g., American Home Products Corp. v. Lockwood Manufacturing Co.*, 483 F.2d at 1123, and *Advanced Hydraulics, Inc. v. Otis Elevator Co*, 525 F.2d at 480, which assert that the existence of other pending litigation over the patent does not automatically excuse delay in the bringing of the suit.

The Seventh Circuit in particular has devoted considerable attention to the matter of pending litigation as a justification for delay. In *Armstrong v. Motorola, Inc.*, 374 F.2d 764, the plaintiff had filed suit against RCA in July 1948 and six months later sent a written notice to infringers. He did not sue Motorola until January 1954 when the suit against RCA was still pending. Citing *Montgomery Ward* and *Kastar*, the court pointed out that Armstrong was not required to sue every possible infringer simultaneously, and it held that Armstrong's delay was justified. In *Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d 477, the Court reviewed its decision in *Motorola* and rejected appellant's argument that the case stood for the principle that the existence of other pending litigation over the patent is a complete bar to the assertion of a laches defense. The Court pointed out that in both *Motorola* and *Clair*, the infringers had actual notice of the pending litigation, and it limited the holdings to that fact. In *Advanced Hydraulics* no actual notice to the defendant was either alleged or proven, and the court held that the fact of pending litigation did not justify or excuse the delay.[5] The court stated the rule as follows: "notice of 'other litigation' must be given to all known parties who are thought to be infringers; otherwise manifest injustice would result." 525 F.2d at 481. *See also TWM Manufacturing Co., Inc. v. Dura Corp.*, 592 F.2d at 349 (other litigation involving the same patent but a different adversary should not toll the running of the laches period); *American Home Products*

---

**5.** *Advanced Hydraulics'* finding of no notice to defendants marks a departure from earlier cases which had stated the filing of a suit against another party automatically constituted notice to other infringers. *See, e. g., Montgomery Ward & Co. v. Clair*, 123 F.2d at 883 (a suit pending to sustain the validity of a patent is notice to all infringers of the insistence of the patentee upon his claimed rights).

*Corp. v. Lockwood Manufacturing Co.*, 483 F.2d at 1123 (plaintiff pursuing other litigation must assert to the other infringers its intention to bring a subsequent action at the termination of the presently pending action); *Maxon Premix Burner Co., Inc. v. Eclipse Fuel Engineering Co.*, 471 F.2d 308, 313 (7th Cir. 1972) *cert. denied*, 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 591 (1973) (defendant had full notice that plaintiff intended to enforce its patent rights by reason of plaintiff's earlier infringement action against defendant); *Baker Manufacturing Co. v. Whitewater Manufacturing Co.*, 430 F.2d at 1015 (plaintiff involved in other litigation should have at least notified defendant that it was pressing its claim of infringement).

■ We think the rule outlined by the Seventh Circuit and adopted as well by the Sixth is a proper one. Where the plaintiff is engaged in other litigation involving the patent, to escape a defense of laches he must at least inform the potential infringer of his intent to pursue his rights under the patent.

### B. *Application to the Facts*

With this general survey before us, we turn to the facts of the present case. Throughout the early 1960s, Ziegler and his colleagues had several meetings to discuss possible infringement of various Ziegler patents and to consider action against the alleged infringers, including Eastman. Preliminary observations led to the belief that Kodak was infringing the '115 patent (in the initial suit but not involved in this appeal) and in early 1966 Ziegler and Dr. von Kreisler, Ziegler's associate and general patent adviser, discussed the possibility of offering Eastman a license under the '115 patent. In July 1966 von Kreisler wrote Eastman about the '115 patent, and in November 1966 Ziegler formally offered Eastman a license under the '115 patent. Eastman replied that the patent "has no pertinence to our manufacture of polymers" and declined the license offer.[6]

The '332 patent issued on June 21, 1966. Eastman's use of the 409 catalyst at issue in this suit began in the spring of 1967. Prior to that time Eastman's catalyst did not contain an aluminum triakyl, one of the components of the '332 patent. In May of 1967 Ziegler offered Eastman a license under the '332 patent. Eastman promptly rejected the offer for the reasons expressed in its rejection of the '115 offer.[7] Later in 1967 Ziegler sued Phillips Petroleum on the '332 patent, a suit which put in issue both the scope and the validity of the patent.

In January 1970 Ziegler's American patent attorneys corresponded with Eastman's retained counsel, offering Eastman a license for polypropylene rights under various Ziegler patents. This offer was rejected. By letter of June 3, 1970, Ziegler's counsel indicated their inability to draw a conclusion as to whether Eastman's operations fell within the coverage of Ziegler's patents and asked Eastman to supply infor-

---

6. The letter also stated the following:

We assume that you and Professor Ziegler are aware that our scientists have developed a number of different catalyst systems for polymerization of $\delta$-olefins. You perhaps have seen our various patents and literature articles describing such catalysts. We are convinced that none of them, including our commercial systems, are in any way covered by the claims of U.S. 3,113,115. In any event, Eastman is not using an alkyl aluminum halide at all in its commercial operations.

We suppose that your inquiry has been prompted by publications by our scientists which disclose alkylaluminum dihalide catalysts. Distinctions between this type of catalyst and the type covered by Ziegler's patent are made clear in several publications. . .

Again we thank you for the offer of a license. As a company policy we do not knowingly infringe the valid patent rights of others. Therefore, I can assure you that if we had any reason to believe that we needed a license we would seriously consider your offer. However, in the present situation we feel sure that a license is not necessary.

7. Eastman stated "For the reasons given in my letter of December 22, 1966, we do not see any possibility that Eastman Kodak Company would be interested in a license under Dr. Ziegler's patent."

mation about its operations that would enable Ziegler's counsel to arrive at such a conclusion. Eastman responded by counsel that "these operations are highly proprietary and important to my client and certainly not subject matter which should be imparted to others." Counsel further stated that "having looked into the matter as far as we can, my client sees no necessity for having such a license as you propose and has no interest in entering into negotiations concerning the same." On August 27, 1970, Ziegler's counsel again informed Eastman's counsel that this lack of information rendered a final decision on an infringement action impossible. Counsel pointed out that Ziegler was involved in several litigations involving the '115 and '332 patents and would have to concentrate on those actions. The letter then stated

We wish to make it perfectly clear, however, on behalf of Professor Ziegler that your client, Eastman Kodak, should not consider any inactivity on Professor Ziegler's part with respect to them at this time an acquiescence to any position which they or you might take with respect to the patent position, and such inactivity is simply due to lack of information concerning your client's activities and the involvement of Professor Ziegler in enforcing his patent rights against others. We wish to make it perfectly clear that at such time when Professor Ziegler is in a position to determine and evaluate the activities of your client, Eastman Kodak, should he determine that in his opinion an infringement situation exists, he will promptly and vigorously enforce his patent rights against Eastman Kodak, and this should be taken into consideration by your client in connection with any continuance or expansion of their activities in the field.

In July 1970, Ziegler sued Dart Industries for infringement of the '115 and '332 patents. The decision in the suit against Phillips became final on December 3, 1973. SGK sued Eastman on March 20, 1974.

The District Court in its conclusions of law determined that the suit was barred by laches and estoppel because Eastman had been prejudiced by SGK's inexcusable and unreasonable delay in filing suit. It found that Eastman had substantially expended its investment and production at the Longview, Texas, plant before institution of the suit. Before any of the patents issued Eastman had expended $11,000,000 and thereafter it expended an additional $6,000,000. According to the court's findings of fact, production was increased from an initial 7,500,000 lbs. per year in 1961 to more than 120,000,000 lbs. per year by the time the complaint was filed. The Court further found that between the issuance of the patents and the institution of the suit, Eastman's production using the 409 catalyst increased about two-fold. As further prejudice to Eastman the Court found that three key participants in Ziegler's patent affairs, including Ziegler himself, had died, and the memory of a fourth had been dulled. Furthermore, the Court concluded that many documents which could have an important bearing on issues raised in the litigation were missing.

Turning to SGK's conduct during the delay, the Court found that SGK was aware of Eastman's commercial entry into the polypropylene market since at least 1963 and that SGK believed throughout the entire period from at least 1964 until suit that Eastman was an infringer of one or more of Ziegler's catalyst patents. At no time during the contacts between Ziegler and Eastman during the 1966–1970 period did Ziegler openly charge infringement or state that Eastman needed a license in order to operate its plant. The Court asserted that none of these contacts was such that Eastman was put in reasonable apprehension of being sued for infringement on the patents in suit. The Court measured the delay from the time the patent issued, finding that the delay on the '332 patent was 7 years, 9 months. Based upon these considerations the Court held that SGK's delay was unreasonable and inexcusable.

We feel that the District Court clearly erred in its analysis of the facts and the application of the law to those facts when it

held the action barred by laches and estoppel. We agree that the factors which the Court cited are sufficient to constitute injury and prejudice to the defendant, but we cannot agree that, as a matter of law, the plaintiffs' conduct was unreasonable and inexcusable. From shortly after the time Eastman started using the 409 process until the time of suit, SGK took a number of actions which would indicate that it would pursue its patent rights and that it saw Eastman as a possible infringer. Its offer of a license indicated that it thought Eastman was employing a process similar to that outlined in the patent. Its several inquiries about Eastman's operation indicated its continuing desire to prosecute its rights and its ongoing suspicion that the Eastman process infringed its patents. At the same time, SGK (through its predecessor Ziegler) was litigating over the '332 patent in two separate suits. Furthermore, it explicitly indicated to Eastman that it was involved in litigation, and warned that those pending suits were not to be seen as the only action it would take to protect its patent rights. This notice came only a little over three years after Eastman began using the 409 process and only four years after the patent issued. Within three months of the conclusion of one of the suits Ziegler was prosecuting, and while the other suit was still pending, SGK filed its suit against Eastman. The facts here seem to fall easily within the bounds of those cases, discussed earlier, where other pending litigation has been a sufficient justification for delay. Here SGK actively sought to protect its patent (it sued Phillips only a year after the patent issued) and gave full notice to Eastman. It is unreasonable on these facts to require it to do more.

Eastman argues that there is no evidence that the existence of litigation prevented Ziegler from instituting the present suit. We know of no appellate case which has established a rule requiring the plaintiff affirmatively to demonstrate that the other litigation prevented the prosecution of a patent claim. Quite the contrary, as we noted earlier, the cases have worked from the assumption that a patentee is not re-quired to litigate against all his potential infringers simultaneously. See e. g., *Clair v. Kastar, Inc.*, 148 F.2d at 646; *Montgomery Ward v. Clair*, 123 F.2d at 883. The most the cases have required, in dicta, is that the defendant be informed of the pending litigation and of the plaintiff's intent to pursue his rights against a possible infringer. See *Advanced Hydraulics, Inc. v. Otis Elevator Co.*, 525 F.2d at 481; *American Home Products Corp. v. Lockwood Manufacturing Co.*, 483 F.2d at 1123. Those requirements have been met here.

As we pointed out earlier, estoppel—the preclusion of prospective or continuing relief—requires not only delay by the plaintiff and prejudice to the defendant but also misleading action by the plaintiff which causes the defendant to engage in conduct which would result in its injury if the suit were allowed to go forward. The plaintiff must have made representations or engaged in conduct which justifies an inference of abandonment of the patent claim or which has induced the infringer to believe that its business would be unmolested. As the Sixth Circuit observed in *TWM Manufacturing Co., Inc. v. Dura Corp.*, 592 F.2d at 350, for silence to work an estoppel, "some evidence must exist to justify an inference that the silence was sufficiently misleading to amount to 'bad faith.'" See also *Continental Coatings Corp. v. Metco, Inc.*, 464 F.2d at 1379–80.

Here we can find no misleading conduct by SGK. At no point did SGK indicate or imply that it was abandoning its interest in Eastman's operation. Quite the contrary, SGK's letter of August 27, 1970, explicitly warned Eastman that SGK's failure to pursue the matter immediately could not be viewed as an acquiescence in Eastman's position. Furthermore, throughout much of the period, SGK was prosecuting other possible infringers. Its conduct can hardly be construed as lulling Eastman into a false sense of security. Accordingly, SGK is not estopped from pursuing its action against Eastman.

The '792 patent issued on July 30, 1974, and was asserted against Eastman on July 31, 1974. Although there was no unreasonable delay in bringing suit after the patent issued, Eastman contends, and the District Court held, the conclusion of unreasonable and prejudicial delay is applicable to the '792 patent because SGK purposely and unjustifiably delayed issuance of the patent for eight years in order to extend its monopoly on the use of the '332 catalyst. Because we find that SGK did not unreasonably and inexcusably delay bringing suit on the '332 patent, we must reject the trial court's holding of laches on the '792 claim. Even if the patent had issued at the time of the '332, an action brought on it in 1974, in light of the facts we have articulated would not have been barred.

Because we find that SGK's delay is not unreasonable in light of the foregoing facts, we need not address the question whether Eastman misled SGK in connection with its 409 catalyst.

## III. THE '332 PATENT

The '332 patent, entitled "Polymerization of Ethylene," expressly relates to "new and useful improvements in the polymerization of ethylene for the production of high molecular polyethylenes." According to the teachings of the patent, gaseous ethylene is polymerized into high molecular polyethylenes by contact with a catalyst formed by mixing an aluminum trialkyl compound with a compound of a metal of Group IVB, VB, or VIB of the Periodic System of the Elements. Examples outline the use of catalysts composed of such compounds as aluminum triethyl and titanium tetrachloride.

SGK contends that the '332 patent is not limited to the polymerization of ethylene, but rather includes other olefins, such as propylene. SGK points to the testimony of one of Professor Ziegler's research colleagues to the effect that at the time Ziegler sought the patent, he understood it to include the polymerization of propylene as well as of ethylene. SGK further argues that Eastman's 409 catalyst infringes the catalyst taught in the '332 patent. Because

we conclude that the '332 patent does not extend to the polymerization of propylene, we need not reach the issue of the equivalence of the 409 catalyst with that taught in the Ziegler patent.

### A. Estoppel

Our consideration of SGK's claims under the '332 must begin with Judge Roney's careful analysis in *Phillips*. There a panel of this court had to address the validity and construction of the '332 patent which is once more before us. In *Phillips* the alleged infringing operation mixed aluminum triethyl, titanium tetrachloride, and iodine in the presence of butadiene to produce polybutadiene.

SGK sought a determination that the '332 patent covered Phillips' operation. We declined to supply that broad a construction to the patent. Rather, we concluded that "any construction of the '332 patent that would encompass a catalyst for the polymerization of butadiene was "untenably broad." We stated that the '332 patent "is limited to the polymerization of ethylene and was not intended to encompass the formation of high *cis* polybutadiene." 483 F.2d at 875.

Eastman contends that because of our decision in *Phillips*, SGK is estopped from again raising the construction of the '332 patent. According to Eastman, SGK is bound by our assertion that the '332 patent is limited to the polymerization of ethylene. Consequently, Eastman contends, SGK may not assert the protection of the '332 patent against Eastman's 409 catalyst, which is used to polymerize propylene, not ethylene.

This Circuit has expressed its willingness to discard the rule of mutuality of estoppel, thereby precluding a party from relitigating an issue decided against him in a prior action, even if the party asserting the estoppel was a stranger to the prior action. At the same time, however, we have recognized that a prior litigation will not create estoppel in every circumstance. To give collateral estoppel effect to a prior determination we have required that (1) the issue to be concluded must be identical to that

involved in the prior action; (2) in the prior action the issue must have been actually litigated; and (3) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment. *Matter of Merrill,* 594 F.2d 1064, 1067 (5th Cir. 1979); *Stevenson v. International Paper Co., Mobile, Alabama,* 516 F.2d 103, 110 (5th Cir. 1975); *James Talcott, Inc. v. Allahabad Bank, Ltd.,* 444 F.2d 451, 458–59 (5th Cir.), *cert. denied,* 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971); *Rachal v. Hill,* 435 F.2d 59, 62 (5th Cir. 1970), *cert. denied,* 403 U.S. 904, 91 S.Ct. 2203, 29 L.Ed.2d 680 (1971).

The Supreme Court has articulated similar principles in the patent area in *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). There the Court had before it the issue of the effect to be given a prior determination of patent invalidity. The Court explicitly overruled its earlier decision in *Triplett v. Lowell,* 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936), which had held that a determination of patent invalidity is not res judicata against the patentee in subsequent litigation against a different defendant. Noting the arguments in favor of rejecting the doctrine of mutuality of estoppel, the Court's decision in *Blonder-Tongue* allowed a defendant charged with infringement to raise a plea of estoppel where the patent in question had been declared invalid in a different adjudication.

At the same time, however, the Court recognized that the estoppel plea may not be employed automatically or too broadly. Rather, the issue must be identical with that presented in the prior adjudication, and the patentee must have had a full and fair chance to litigate the validity of the patent. 402 U.S. at 323, 332–34, 91 S.Ct. at 1444.

We have examined the issue of estoppel in a variety of patent contexts. Our decisions reflect a strong insistence upon strict compliance with the three requirements outlined above. In *Brose v. Sears, Roebuck & Co.,* 455 F.2d 763 (5th Cir. 1972), and

*Kaspar Wire Works, Inc. v. Leco Engineering and Machine, Inc.,* 575 F.2d 530 (5th Cir. 1978), we held that a consent decree in a suit attacking patent validity does not act as collateral estoppel in the absence of clear evidence concerning the parties' intention. As we noted in *Kaspar Wire,* the prior decree "was based entirely on the consent of the parties, and involved neither a judicial determination nor a stipulation of the parties with respect to the validity of [the patent] or its infringement." 575 F.2d at 539–540. In *In re Yarn Processing Patent Validity Litigation,* 498 F.2d 271 (5th Cir.) *cert. denied,* 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974), we pointed out that in order to invoke estoppel, the issues must be the same as those previously decided. Because we found that the date of invention and the date of reduction to practice were separate issues, only one of which had been adjudicated earlier, we rejected the estoppel argument.

[34] Applying these teachings to the case before us, we conclude that SGK is not estopped from charging Eastman with infringement. We observe at the outset that the validity of the '332 patent is not at issue here. The patent's validity was upheld in *Phillips* and was not challenged by Eastman. The issue is instead whether the '332 patent applies to the polymerization of propylene. The question in *Phillips* was whether the '332 patent extended to the polymerization of butadiene to form high cis-polybutadiene rubber. The two questions are not the same. Unlike propylene, butadiene is a conjugated diolefin whose special properties set it apart from members of the homologous series containing ethylene or propylene. Even if the monomer involved in *Phillips* had been butylene, in light of the different properties possessed by olefins with higher numbers of carbon atoms, a finding that the patent did not cover butylene ($C_4H_8$) would not necessarily have entailed a determination that it did not cover propylene ($C_3H_6$).

We acknowledge that language in *Phillips* states that the '332 patent is limited to the polymerization of ethylene. That lan-

guage, however, is not necessary to the determination of the issue in *Phillips*. Only our holding that the patent was not intended to encompass the formation of high-cis-polybutadiene is necessary.

Because our statements limiting the patent to the polymerization of ethylene are not necessary and essential to the result in *Phillips*, they may not be used as a basis for estoppel in the present case.

### B. *Scope of the '332 Patent*

██ We thus turn to the question whether the '332 patent teaches the polymerization of propylene. The resolution of this issue is a matter of construction, which is for this Court to decide for itself, but in ascertaining the appropriate construction, we must rely upon certain factual findings of the District Court unless those findings are clearly erroneous. Fed.R.Civ.P. 52(a). As we pointed out in *Phillips*, in construing a patent we look to the claims of the patent itself and to the intention of the patentees. 483 F.2d at 874.

In examining the claims of the patent we find no express teaching concerning the polymerization of propylene. We reaffirm our views in *Phillips* in this regard:

No intent to claim a catalyst for the polymerization of monomers other than ethylene may be gleaned from the patent as a whole. The '332 patent is entitled "Polymerization of Ethylene;" its preamble states emphatically and succinctly that "[t]his invention relates to new and useful improvements in the polymerization of ethylene for the production of high molecular polyethylenes;" the preamble lists five "Objects of Invention," all five of which deal only with "ethylene" or "polyethylene;" the description preceding the claims focuses solely upon the polymerization of ethylene; and the Examples without exception are limited to the production of "high molecular polyethylenes" from ethylene. 483 F.2d at 874–75.

SGK argues that our analysis and holding in *Phillips* that propylene is a monomer coming within the scope of Ziegler's '115 patent is equally applicable to the Zie-

gler '332 patent. We disagree. In *Phillips* we went to great pains to point out that the language of the '115 patent expressly covered more monomers than ethylene. First, the title of the patent ("Polymerization Catalyst") did not limit the claimed catalyst to the polymerization of any particular monomer. Second, the "Objects of Invention" listed in the specification indicated that monomers other than ethylene were within the contemplated scope of the patent. Indeed, the specification stated that the catalyst was for use with lower olefins up to about $C_5$, which, of course, includes propylene. Third, one of the Examples in the patent expressly encompassed propylene. None of these factors is present in the '332 patent. The '332 patent's title and examples deal only with the polymerization of ethylene. Nowhere in the patent is there mention of the use of the catalyst with monomers other than ethylene.

SGK contends that the '332 patent teaches the polymerization of propylene and ethylene obtained from the cracking of propane and ethane. To support its position, SGK cites to columns 3 and 4 of the patent which state

Further, in accordance with the invention, instead of pure ethylene, ethylene-containing gas mixtures may be directly used for the polymerization, for example, gases which are generated during the cracking of saturated hydrocarbons, such as ethane or propane, or from mineral oil or its fractions, or generated during similarly conducted Fischer-Tropsch synthesis, and possibly freed from other olefins.

SGK's own expert witness, however, did not state that this language taught the polymerization of propylene. Asked by counsel to explain his understanding of the teaching of the '332 patent, Dr. Herman Mark, a chemist, replied in part that "gas mixtures may be poylmerized by contacing them with this catalyst, such gas mixtures, for instance, produced by the cracking of a mixture of ethane or propane, which means ethylene and propylene solvents may be used." Shortly thereafter in his testimony Dr. Mark stated that "at the bottom of

Column 3 is stated that gas mixtures— ethylene containing gas mixtures may be directly used for the polymerization and, as an example for such a gas mixture, a mixture of ethane or propane can be used after cracking, which, of course, would indicate that propylene would be present." On cross-examination Dr. Mark was asked if he could point out where propylene is disclosed as a monomer. He answered, "No, in the 332 patent propylene is not specifically mentioned as a monomer, and it is not actually disclosed in any specific example, so the only reference to the possibility of using propylene is in this sense which I have read." Dr. Mark indicated he was referring to the reference to ethylene-containing gas mixtures, and observed that the cracking of such mixtures would give ethylene and propylene. The following exchange then took place between Dr. Mark and defense counsel:

Q. Is it your opinion that there is a disclosure of propylene as a monomer for utilization with this catalyst?

A. This is not a good disclosure, it is just mentioned, the possibility that propane may be used.

Q. The word "propylene" was known at that time?

A. The word "propylene" doesn't occur in the patent.

2. But the word "propylene" was known?

A. Sure.

Q. And there wouldn't have been any problem in writing "propylene", if that is the intent, would there?

A. No.

The most that can be made of Dr. Mark's testimony is that the patent teaches that polyethylene may be produced from a gas mixture containing both ethylene and other monomers, including propylene. Such an understanding comports with the stated object of the '332 patent, the polymerization of ethylene. The paragraph merely reveals one more condition under which the polyethylene may be produced. It does not introduce, in a most casual and off-handed

way, a new object of the patent. We thus hold that the patent does not expressly teach the polymerization of propylene.

Beyond the actual claims of the patent, SGK contends that Ziegler knew that the '332 catalyst was useful for the polymerization of propylene and had a clear intent of claiming a catalyst for producing polypropylene. SGK further asserts that the evidence presented at trial indicates that the '332 patent was specifically issued with the understanding that its claims covered a catalyst that polymerized propylene into polypropylene. SGK points to the testimony of Dr. Heinz Martin, one of Ziegler's coworkers in Germany. Martin stated that he and his co-inventors knew that the catalyst disclosed in the '332 patent was used for polymerizing propylene and that when the patent issued it was Ziegler's intent that the patent would cover a catalyst for polymerizing propylene.

■■ The issue of the intent and understanding of the patentees is a factual one within the province of the trial court, whose finding will be reversed only if it is clearly erroneous. *Bird Provision Co. v. Owens Country Sausage, Inc.*, 568 F.2d 369, 372 (5th Cir. 1978) (findings of fact in patent cases are tested on appeal under the "clearly erroneous" standard of review). Viewing the record as a whole, we cannot conclude that the district judge erred in his determination. Eastman introduced evidence that at the time Ziegler had completed the invention of the '332 patent in December 1953, Ziegler had not ·polymerized propylene to solid propylene. Indeed in a patent proceeding in Australia in 1970 Ziegler stated that he had tried to polymerize propylene in his first runs but had failed. Not until July 1954 did he succeed in polymerizing propylene. Although Ziegler had polymerized propylene before he filed the U.S. patent application (but after he had filed in Germany), he made no mention of it in the application. He filed a separate application in Germany covering propylene and subsequently sought to protect the use of his catalyst in polymerizing propylene through a separate U.S. patent application.

In this application, S.N. 514068 Ziegler stated that a pending application, S.N. 469059 (which resulted in the '332 patent), "describes a method for polymerizing ethylene to high polymers." Ziegler conceded that "it was not apparent from the work with ethylene that the same or similar catalysts would be useful in the production of high molecular weight polymers of the alpha-olefines [sic] [such as propylene]." Ziegler expressed a similar view of the scope of the '332 patent in other patent applications.

In light of this evidence, the District Court was justified in finding that Ziegler intended to limit the '332 patent to the polymerization of ethylene. Its conclusions in this regard are not clearly erroneous.

Finally an examination of the chemistry involved and the understanding of men skilled in the art leads to the conclusion that the '332 patent teaches only the polymerization of ethylene.

There was expert testimony to the effect that ethylene and propylene, though close members of an homologous series, possess significantly different properties, which could make them respond differently to the '332 catalyst. These differences are sufficiently important as to preclude the automatic assumption that the polymerization of one with a given catalyst would mean the polymerization of the other with the same catalyst. Dr. C. S. Overberger, a chemist, testified that the first and second members of an homologous series often react quite differently. A polymer of ethylene has only one hydrogen atom attached to the carbon atoms and can exist

essentially only in a linear chain form. In polypropylene, on the other hand, a methyl group attaches to every other carbon, which can produce a wide variety of molecular configurations. Indeed, as noted earlier, polypropylene may exist in two general forms, isotactic, which is stereo regular and takes a crystalline form, and atactic, where the methyl groups have less regular arrangement and is amorphous. Ziegler himself, in his patent application S.N. 514068 acknowledged that "the usefulness of a catalyst as initiator for the polymerization of higher homologous of ethylene cannot be predicated on, or assumed from, the usefulness thereof as initiator of ethylene polymerization." Thus even the inventor recognized that a catalyst for ethylene would not automatically be a catalyst for propylene.

▮ After this survey of the patent, the patentee's intent, and the underlying chemistry involved, we hold that the District Court properly found the '332 patent limited to the polymerization of ethylene. Because we find that the production of polypropylene is not encompassed by the patent, we need not address the issue of whether Eastman's 409 catalyst infringes the patented catalyst by the doctrine of equivalents.

## IV. The '792 PATENT

### A. *Validity*

#### 1. *Prior Art*

The District Court held that claims 22 through 32 of the '792 patent—the claims relating to the polymerization of propylene or other higher olefins [8]—were invalid be-

---

8. The claims in issue are as follows:

22. Method for the polymerization of alpha-olefins, which comprises contacting such olefin with a catalyst formed from an organometal component comprising an aluminum trialkyl and a heavy metal component comprising a compound selected from the group consisting of salts and the freshly precipitated oxides and hydroxides of metals from Groups IV–B, V–B and VI–B of the Periodic System, including thorium and uranium, and recovering a high-molecular polymer formed.

23. Method according to claim 22, in which said heavy metal component is a titanium chloride.

24. Method according to claim 23, in which said organometal component is aluminum triethyl.

25. Method according to claim 22, in which said organometal component is aluminum triethyl.

26. 'Method according to claim 22, in which said olefin is propylene.

27. Method according to claim 26, in which said heavy metal component is a titanium chloride.

28. Method according to claim 27, in which said organometal component is aluminum triethyl.

cause they were anticipated by the disclosure of prior art as revealed in patent No. 3,582,987 ('987) to Professor Giulio Natta. The '987 patent, entitled "Method for Producing Polymers and Copolymers of Certain Unsaturated Hydrocarbons," teaches the use of a catalyst prepared by reacting titanium tetrachloride with a triethyl aluminum to produce high molecular weight polymers of the higher homologues of ethylene, such as propylene.[9] The '987 patent thus discloses the same catalytic process as that at issue in Ziegler's '792 patent.

According to the District Court, Natta's '987 patent had an Italian filing date of July 27, 1954, while the earliest possible effective invention date of the Ziegler '792 patent was August 3, 1954, the filing date of Ziegler's German application Z4348 covering the polymerization of propylene.[10] Thus the Court found that the Natta patent was prior art, and the Ziegler claims were invalid.

■ Although the existence of a foreign patent is relevant as prior art, *Rosen v. Kahlenberg*, 474 F.2d 858, 871 n.7 (5th Cir. 1973), determining whether a particular for-

eign patent constitutes prior art for purposes of a challenge to the validity of another patent requires an examination of patent law and the judicial constructions placed on that law.

The patent laws outline a series of provisions which will defeat patentability of an invention. 35 U.S.C. § 102. Those which are relevant here are §§ 102(e) and 102(g). Section 102(e) provides that a person shall be entitled to a patent unless "the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for the patent . . . ." Section 102(g) allows patentability unless "before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it."

Section 119 deals with filings in foreign countries and provides that an application for an American patent by a person who has previously filed a patent application in a foreign country "shall have the same effect as the same application would have if filed in this country on the date on which

---

29. Method according to claim 22, in which said catalyst is formed by mixing said organometal component and said heavy metal component in the presence of an organic solvent.
30. Method according to claim 29, in which said heavy metal component is a titanium chloride.
31. Method according to claim 30, in which said olefin is propylene.
32. Method according to claim 31, in which said organometal component is aluminum triethyl.

9. The abstract of the '987 patent is as follows:
 There is disclosed a process for polymerizing unsaturated hydrocarbons of the formula
 $$CH_2 = CHR$$
 in which R is a saturated aliphatic, an clicylic or an aromatic radical, alone, in mixtures with one another, or in mixtures with small amounts of another monomer copolymerizable therewith. In the formula given, R may be, in specific modifications, an alkyl, cycloalkyl, or aryl radical. The process involves polymerizing the unsaturated hydrocarbons, alone or in the mixtures, in contact with a catalyst prepared from a halide of a transition metal belonging to Groups IV to VI inclusive of the Mendeleeff Periodic Table and an alkyl compound of a metal belonging to

Groups II to III of said Table, in the presence of the monomer.

10. The Ziegler German application states that "with catalysts of identical or analogous type, ethylene homologs may also be converted to plastic-like polymers. This is true particularly for propylene. . . ." The U.S. application in which Ziegler first disclosed the polymerization of homologues of ethylene, S.N. 514,068, was filed June 8, 1955. It stated as one of its objects providing a process "for the production of alpha olefine polymers and copolymers."

The trial court found that the disclosure of the '792 patent was based on an application filed July 1, 1958, that consolidated four earlier patent applications, including S.N. 514,068. An invention is entitled to the earliest priority date of any application which adequately discloses its subject matter. 35 U.S.C. § 120; *Hinde v. Hot Sulphur Springs, Colorado*, 482 F.2d 829, 835 (10th Cir. 1973); *Acme Highway Products Corp. v. D. S. Brown Co.*, 431 F.2d 1074, 1078–79 (6th Cir. 1970), *cert. denied*, 401 U.S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239 (1971); *Bendix Corp. v. Balax, Inc.*, 421 F.2d 809 (7th Cir.), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed.2d 562 (1970).

the application for patent for the same invention was first filed in such foreign country." Eastman contends that this means the Natta '987 patent is effective as a prior art reference as of its Italian filing date. Since that date precedes the filing date of Ziegler's German patent on polypropylene, Eastman argues, the Ziegler claims are invalid.

This Circuit has never explicitly addressed whether the filing date of a foreign patent may be used as the date of filing in the United States for the purposes of showing prior art under § 102(e) and (g). The Court of Customs & Patent Appeals has addressed this general issue, though in somewhat different contexts, on several occasions, and the District of Columbia Circuit has adopted the view articulated by that court. Although we may explore the issue on our own, we are reluctant to disagree with a court whose day-to-day activities require it to interpret and explicate patent law. This is particularly true, where, as here, the C.C.P.A.'s decision is a carefully reasoned examination of the relevant statutory provisions.

In an extensive inquiry into the effect of a foreign filing upon a U.S. patent used as a prior art reference, the Court of Customs and Patent Appeals held that a patent was not effective as a prior art reference under 35 U.S.C. § 102(e) as of its Swiss filing date. Rather, the patent was effective as prior art only as of the U.S. filing date. *Application of Hilmer*, 359 F.2d 859, 53 C.C.P.A. 1288 (1966) (*Hilmer I*). In *Hilmer I* the appellants showed their earliest invention date as July 31, 1957, the date when they filed for a German patent. The patent relied upon as a prior art reference had a U.S. filing date of January 23, 1958, but also had a date of filing in Switzerland of January 23, 1958. The appellants thus could show that their invention occurred before the U.S. filing of the reference patent but they could not show their invention before the Swiss filing date of the U.S. patent. The Patent Office Board of Appeals gave the U.S. patent effect as prior art as of a foreign filing date. The Court of Customs and Patent Appeals reversed.

The Court pointed out that a patent may be entitled to a foreign filing date for some purposes and not for others. 359 F.2d at 863. Examining the language and legislative history of § 119, which allows a U.S. patent application to be effective as of its foreign filing date, the Court asserted that the purpose of § 119 was in establishing "priority" between parties directly competing for a patent on the same invention. The use of the foreign filing date as a priority right was "a protection to one who was trying to *obtain* patents in foreign countries, the protection being against patent-defeating provisions of national laws based on events intervening between the time of filing at home and filing abroad." 359 F.2d at 873.

Because § 119 was directed to priority between competing parties and § 102(e) was concerned with the elements which would defeat a patent, quite apart from priority disputes between parties, the Court refused to hold that the language in § 119 overrides the express requirement in § 102(e) that a patent relied on as a prior art reference be "*filed in the United States* before the invention" by current applicant. Thus under the *Hilmer I* doctrine, a prior art reference patent is effective only as of its U.S. filing date. The Court of Customs and Patent Appeals implicitly reaffirmed its position in *Hilmer II, Application of Hilmer*, 424 F.2d 1108, 57 CCPA 985 (1970), and *Application of McKellin*, 529 F.2d 1324 (Cust. & Pat. App.1976). The Court of Appeals for the District of Columbia reached a similar conclusion in *Eli Lilly & Co. v. Brenner*, 375 F.2d 599 (D.C.Cir.1967).

In *Hilmer II* the Court of Customs & Patent Appeals extended this interpretation to § 102(g). Just as in *Hilmer I* § 119 did not override the "filed in the United States" language of § 102(e), so in *Hilmer II*, § 119 did not remove § 102(g)'s limitation of "in this country." The essence of the Court's view is found in the following statement:

That [an alleged prior inventor], as an applicant, was entitled to the benefit of

his [foreign] filing date does not mean that his invention acquires that same date under § 102(g) as patent-defeating prior art, in direct contravention of the "in this country" limitation of the section. 424 F.2d at 1113.

Eastman contends that our decision in *James B. Clow & Sons, Inc. v. United States Pipe & Foundry Co.*, 313 F.2d 46 (5th Cir. 1963) compels us to arrive at a different result. There, however, the issue was who was the first inventor under a priority claim between inventors. An interference between the two inventing parties had been privately settled in an allegedly fraudulent manner. In *Clow* we held that private parties could not conclusively settle the question of who the first inventor is, and we directed the trial court to see if the patent owner had properly won the interference, so as to be entitled to a valid patent. We pointed out that the foreign application was not being offered on the issue of anticipation or obviousness. Indeed, Eastman apparently concedes that *Clow* did not reach the issue. Thus our decision in *Clow* reflects the distinction—which is at the heart of this issue in today's case—between the use of a foreign application to determine priority and the use of a foreign application to establish prior art. We thus join our brethren in the Court of Customs & Patents Appeals in declaring that for purposes of determining whether a patent may serve as a prior art reference under § 102(e) or (g), the effective date is its date of filing in the United States.

Ziegler's German application covering the polymerization of polypropylene was filed August 3, 1954. Natta's U.S. filing occurred on June 8, 1955. Consequently, the Natta patent is not a reference of prior art and cannot render the Ziegler '792 patent invalid.

### 2. *Other Challenges*

The District Court held the '332 and '792 patents invalid, insofar as they purport to teach catalysts or processes for the polymerization of propylene because (1) the patents fail to contain sufficient description of the invention as to enable any person skilled in the art to which it pertains to make and use the invention; (2) because the patent specifications do not set forth how to make a useful, practical product as required by 35 U.S.C. § 101; and (3) because the inventors did not set forth in their applications the best mode contemplated by them for the practice of their invention as required by § 112. SGK appeals the Court's holding of invalidity on each of these grounds. Since we held that the '332 patent does not teach the polymerization of propylene, we need deal with these issues only in the context of the '792 patent.

The patent statute, 35 U.S.C. § 102, requires that a patent must be directed to subject matter which is "new and useful." Section 112 mandates that a valid patent shall

> contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

In construing this language, the courts have recognized that in meeting the statutory disclosure requirements, it is merely necessary that the patent illustrate some embodiments of the invention and not all of them, *Ziegler v. Phillips Petroleum Co.*, 483 F.2d 858, 871 (5th Cir.), *cert. denied*, 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973); *Noll v. O. M. Scott & Sons Co.*, 467 F.2d 295, 302 (6th Cir. 1972), and this view has been specifically articulated in the context of patents covering catalysts and catalytic processes. *Application of Angstadt*, 537 F.2d 498, 502–03 (Cust. & Pat.App. 1976); *Application of Bowen*, 492 F.2d 859, 863 (Cust. & Pat.App.1974).

Eastman argues that the '792 patent fails to provide any teaching of utility. The Supreme Court in *Brenner v. Manson*, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966), has declared that the practical utility of the

compound produced by a chemical process is an essential element in establishing patentability of the process.

The '792 patent provides two examples of the polymerization of propylene. Example 24 describes the production of granular polypropylene. The example then states that "[t]he solid, granular polypropylene may be pressed at 140° C. to obtain flexible sheets or films which appear transparent in thin films and opaque in thick layers." Example 27 outlines the production of a "white, flocculent polypropylene" and states that the polymer "can be easily pressed into foils and rolled into a sheet."

█ Eastman argues that these descriptions are insufficient to comply with the required demonstration of usefulness. We disagree.

█ Eastman insists that use of the '792 process fails to produce a useful product because to make a useful polypropylene it is necessary to make and separate the polymer having the isotactic structure, according to the process discovered by Natta. Eastman has found this separation process necessary to produce a polypropylene it can market successfully. It asserts that the Ziegler process does not produce a polymer that Eastman can market. Eastman thus appears to equate "useful" in the sense of the patent law with "useful" in the sense of commercial marketability. We find no reason for imposing a standard of commercial marketability upon the requirements of the patent laws. The product of a patented process is useful if it may serve some identifiable purpose other than merely being the end product of a series of chemical reactions. To require the product to be the victor in the competition of the marketplace is to impose upon patentees a burden far beyond that expressed in the statute.

The decision of the Court of Customs and Patent Appeals in *Anderson v. Natta*, 480 F.2d 1392 (Cust. & Pat.App.1973), relied upon by Eastman, is not controlling. There the Court did state that it was "not convinced that the mere production of a sample film . . . is sufficient to establish usefulness in a practical sense as film," 480 F.2d at 1396–97, but the invention in that case was limited solely to a process for making a very specific copolymer, not here at issue. Moreover, the court's language does not deal with patent disclosure at all, but rather with whether a party had, outside the disclosure of its application, actually reduced the patented invention to practice by making something successful, so as to be entitled to an invention date even earlier than its application.

More directly on point is a decision by the Patent Office in *Ziegler v. Baxter v. Natta* (P.O.Bd.Int. 90,833), where the Patent Office held that Ziegler was the first inventor of a specific process directed solely at a method of making polypropylene and that the German equivalent to the '792 patent example 24 disclosed a useful polypropylene. Of course, we are not bound by a decision of the Patent Office, but in this instance we find the logic and reasoning of the Patent Office persuasive and adopt it. Patent '792's disclosure of a transparent or opaque flexible film at 140° C. is a statement of sufficient utility to satisfy the patent statute.

Eastman also challenges the validity of the '792 patent on the grounds that it fails to comply with § 112's requirement that the patent "set forth the best mode contemplated by the inventor of carrying out his invention." SGK and Eastman apparently agree that the '792 patent does not teach how to obtain the highly crystalline, isotactic polypropylene. According to Eastman, this process, discovered by Professor Natta, constitutes the best mode of carrying out the invention. Since Ziegler and his coworkers, as a result of their collaboration with Natta, were aware of Natta's use of $\delta$-TiCl$_3$ as a catalyst component, Eastman argues, the trial court was correct in finding that Ziegler failed to set forth the best mode as required by 35 U.S.C. § 112.

In interpreting § 112, the courts have emphasized the obligation of the inventor to disclose the best method contemplated by him to carry out the invention, as of the time he executes his application. *Dale*

*Electronics, Inc. v. R. C. L. Electronics, Inc.,* 488 F.2d 382, 388–89 (1st Cir. 1973); *Application of Glass,* 492 F.2d 1228, 1233–34 (Cust. & Pat.App.1974); *Application of Gay,* 309 F.2d 769, 50 CCPA 725 (1962); *Benger Laboratories, Ltd. v. R. K. Laros Co.,* 209 F.Supp. 639, 644 (E.D.Pa.1962), *affirmed per curiam,* 317 F.2d 455 (3rd Cir. 1963).

On the other hand, the courts have not required the mode disclosed by the inventor be in fact the optimum mode of carrying out the invention. *Application of Gay,* 309 F.2d at 773. Even if there is a better method, the failure to disclose it will not invalidate the patent if the inventor does not know of it or does not appreciate that it is the best method. *See Benger Laboratories, Ltd. v. R. K. Laros Co.,* 209 F.Supp. at 644, *affirmed per curiam,* 317 F.2d at 456. Instead, the thrust of the decisions in this area has been to require that the inventor act in good faith with no attempt to conceal what he feels is the best method of using the invention. *Benger Laboratories, Ltd. v. R. K. Laros Co.,* 317 F.2d at 456; *Application of Gay,* 309 F.2d at 772.

From our examination of the record we are unable to find sufficient evidence to justify the conclusion that Ziegler knew that the method employed by Natta was the best mode of carrying out the invention. Neither are we able to conclude that Ziegler acted without good faith or in an attempt to conceal what he believed to be the best use of his catalytic process. Under the statute, Ziegler was not required to disclose every known modification of his process. This is particularly true when those modifications are developed by other people. The mere fact that Ziegler knew of other uses of his catalysts does not create a presumption that he contemplated or appreciated those uses to be the best mode of carrying out his invention. In the absence of evidence that Ziegler felt the use of $\delta$-TiCl$_3$ was the best mode of using his catalyst process, we cannot conclude that the '792 patent is invalid for failure to state the best mode.

SGK finally challenges the District Court's conclusion that the '792 patent is invalid because it does not contain a sufficient description of the invention to enable any person skilled in the art to make and use the invention. We agree with SGK that the District Court incorrectly applied the law in this area.

Claims 23, 24, 27, 28, 30, 31, and 32 of the '792 patent are specific as to the combination of components preferred for propylene polymerization. Furthermore, as a result of the disclosure of Ziegler's process, scientists throughout the world were able to polymerize alpha olefins based on the teachings of the Ziegler method.

Eastman complains that the great majority of the catalysts described in the examples, including many of the "preferred" systems, were shown to be inoperative for polymerizing propylene. Even assuming the truth of this assertion, it does not necessarily follow that the patent is invalid. Such claims encompassing myriad operative combinations are not invalid but are merely construed to exclude those inoperative combinations. *Noll v. O. M. Scott & Sons Co.,* 467 F.2d 295, 300 (6th Cir. 1972); *Ansul Co. v. Uniroyal, Inc.,* 301 F.Supp. 273, 288–89 (S.D.N.Y.1969), *affirmed,* 448 F.2d 872, 876–78 (2d Cir. 1971). *See also Application of Bowen,* 492 F.2d 859 (Cust. & Pat.App. 1974). The teachings of the '792 patent adequately describe the invention.

### B. *Infringement*

We must now turn to the determinative question: whether Eastman's catalytic process infringes SGK's '792 patent. SGK's contention, in short, is that the patent, which teaches a catalyst for polymerizing propylene composed of an aluminum trihydrocarbon and a titanium salt, covers a catalyst composed of an aluminum trihydrocarbon, a particular titanium salt, and lithium butyl.

Construing the reach of a patent of this nature is not easy, particularly for non-scientist judges. We must balance the protection to be given the inventor against the need for creativity by others working in the field. We recognize that pioneering pat-

ents deserve broad protection, and we likewise note that a patent need not list every imaginable permutation of its components nor need it anticipate every possible modification developed by those who use it. Yet we must be careful not to give one who makes major advances in an area complete control over all subsequent advances and developments in the same area. We must keep in mind the fact that a patentee is entitled to protection against parties who make minor changes in his invention, but we also must not lose sight of the fact that a patent does not give an individual unlimited protection against every conceivable item which may employ some elements of the teaching of the patent. As noted earlier, to come within the scope of the doctrine of equivalents, the challenged process must produce substantially the same result with substantially the same means in substantially the same manner.

With these considerations guiding us, we hold that the District Court properly construed the '792 patent when it found that the patent did not cover Eastman's 409 catalyst. In reaching this conclusion, we are particularly aware of the fact that in catalytic chemistry, minor changes in components, their ratio, or the external condition of the reaction may produce major changes in the reaction itself. A catalyst which works well at one temperature and pressure, for example, may be totally ineffective at another. Similarly, a small change in the oxidation state of one element of a compound may produce an entirely new catalytic process. Each component of the process—the precise compounds, the ratio of their combination, the external condition of the reaction—may be critical.

Applying these tenets of chemistry to the '792 patent and the 409 process leaves us convinced that the '792 patent should not be construed to cover the 409 process. First, the 409 process contains a component, lithium butyl, which the '792 patent does not mention. Indeed, the '792 patent makes no reference to components other than the aluminum trihydrocarbon and the metallic salt. SGK argues that the complex compound formed by reacting LiBu and $AlEt_3$ produces merely a known and convenient stable form of $AlEt_3$. Thus its addition to the reaction, according to SGK, in no way changes the catalyst. Yet Ziegler filed for different patents where he disclosed new catalysts prepared using complexes such as $LiBu/AlEt_3$ and specifically claimed those complexes. In the absence of testimony, we cannot now conclude that he meant to include those complexes within the '792 patent. In addition, the trial court heard testimony that the presence of LiBu made a significant difference in the final reaction product.

Second, the 409 process uses a particular form of titanium salt, hydrogen reduced alpha titanium trichloride. To be sure, the patent teaches the use of a titanium salt, and the 409 process employs a titanium salt, but it employs a particular form which is neither described nor suggested in the '792 patent. The patent explicitly teaches the use of titanium tetrachloride, but the trial court heard sufficient expert testimony to justify its conclusion that $H\text{-}\delta\text{-}TiCl_3$ is not the same as the titanium salts mentioned in the patent. The physical properties themselves are different. Titanium tetrachloride is a clear, non-crystalline liquid, while $H\text{-}\delta\text{-}TiCl_3$ is a solid, violet-colored crystal. The trial court heard expert testimony that the electron structure of the $H\text{-}\delta\text{-}TiCl_3$ differed significantly from that of the $TiCl_4$ used in the '792 examples. According to this testimony, the differences between the two structures accounted in part for the much greater amount of isotactic polypropylene produced by the 409 process.

Third, the 409 process co-reacts LiBu, $AlEt_3$, and $H\text{-}\delta\text{-}TiCl_3$ in a mol ratio of 0.3 to 0.3 to 1.0. The '792 patent points out the importance of the ratio in determining the kind of polypropylene produced and displays the use of ratios of $AlEt_3$ to $TiCl_4$ of less than 1:1. However, the consequence of these lower ratios is a substantial reduction in the molecular weight of the polymer. To produce high molecular weight polypropylene, such as that sought by Eastman, the

patent suggests using a AlEt$_3$ to TiCl$_4$ ratio of 2:1, or providing an excess of AlEt$_3$. The .3:1 ratio employed in the 409 process is yet another indication that there are underlying differences in the chemical reactions generated by the two processes.

Fourth, Eastman conducts its polymerization at 71 atmospheres of pressure and a temperature of 160° C. Once again, the '792 patent states that temperatures and pressures this high will produce polypropylene, but the whole thrust of the patent's teachings' is that the catalyst works better at lower temperatures and pressures. The patent states, for instance, that "[i]t is advantageous to work at pressures of 1 to 10 atmospheres." Likewise, the patent notes that temperature is not critical, but adds that it is advantageous to operate "at somewhat elevated temperatures and particularly above about 50° C. Thus in olefine polymerization, as contrasted to prior art processes, the monomer contacted with a catalyst in accordance with the invention may be rapidly converted into high molecular polymer even at low pressures of less than 100 atmospheres and temperatures of less than 100° C. Working at temperatures above 250° C. is not advisable because at this temperature the catalysts may decompose to a considerable extent." Thus the Eastman process works best under conditions only marginally effective in the teachings of the patent.

Finally, the 409 catalyst produces a high proportion of isotactic polypropylene, while the '792 produces only minimal quantities. Indeed, for Eastman, that which makes the 409 catalyst attractive is its ability to produce stereoregular polypropylene. The '792 patent, on the other hand, expresses no teaching about its ability to produce stereoregular polymers, and, indeed, most of its product is the amorphous, atactic polypropylene.

All these factors, taken together, lead us to conclude that the District Court's determination on this issue was correct. No single factor by itself is sufficient to put Eastman's 409 beyond the· reach of SGK's '792 patent. When they are con-sidered together, however, they depict a process that produces a different result through means that are different and by an operation that is different. The 409 process is not the equivalent of the '792 process. Consequently, Eastman has not infringed SGK's patent.

## SUMMARY

We REVERSE those portions of the District Court opinion which held SGK's suit barred by laches and estoppel.

We likewise REVERSE the District Court's determination that certain claims of the '792 patent are invalid.

We AFFIRM the trial court's decision that Eastman's conduct does not infringe either the '332 or the '792 patents.